UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

UNITED STATES OF AMERICA

   -v-                                                                   No.  14CR533-LTS

WILBERTO DEJESUS,

        Defendant.

---------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

Defendant Wilberto DeJesus ("Defendant") is charged, in the above-captioned indictment, with distribution and possession with intent to distribute 3,4-methylenedioxy-N-ethylcathinone ("MDEC," commonly known as ethylone) in violation of 21 U.S.C. § 841(b)(1)(C).  Defendant has moved to suppress all statements he allegedly made to law enforcement following his arrest in connection with a controlled delivery of a package.

The Court held an evidentiary hearing on January 7, 2015.  At the suppression hearing, the Government presented the testimony of Department of Homeland Security Investigations unit ("HSI") Special Agents Manuel DeCastro and Maria Stavropoulos.[1]  Defendant submitted an Affirmation in advance of the hearing (docket entry no. 18) and a post-hearing Affirmation (docket entry no. 36).  The Court observed each witness carefully and has reviewed thoroughly the evidence and the pre- and post-hearing submissions of the parties.  This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law.  To the extent any finding of fact includes conclusions of law it is deemed a conclusion of law, and vice versa.  For the following reasons, Defendant's suppression motion is denied.

---

[1] All transcript citations herein refer to the January 7, 2015, hearing.

<u>FINDINGS OF FACT</u>

Agents of U.S. Customs and Border Protection ("CBP") at John F. Kennedy International Airport seized a package mailed from China, which contained ethylone. (Tr. at 7-8.) The package was addressed to Jorge Diaz at 241 West 101st Street, Apartment 7F, New York, NY. (Tr. at 8.) The CBP agents turned the package over to HSI for further investigation. (<u>Id.</u>) Special Agent Maria Stavropoulos was assigned to lead the investigation and was supervised by Special Agent Manuel Decastro. (Tr. at 8, 29.)

HSI agents attempted a controlled delivery of the package to the address provided on July 2, 2014, but were unsuccessful. (Tr. at 9-10, 31.) During the course of the investigation, Special Agent Stavropoulos queried an unspecified database for information regarding the address in question, and received "New York City" as the search result, indicating that the apartment was subsidized by the New York City Housing Authority ("NYCHA"). (Tr. at. 69.) Special Agent Stavropoulos "was [later] told by the New York City Housing Authority that the sole authorized occupant of the apartment was one Deolinia Ruiz." (<u>Id.</u>)

The HSI agents made a second attempt to deliver the package on July 14, 2014. (Tr. at 11, 72.) HSI Special Agent James Flynn, disguised as a delivery person from a company called TNT, knocked on the door of Apartment 7F. (Tr. at 7, 9, 11, 36.) Defendant answered the door and signed for the package, writing the name "J. Diaz," and then Defendant was immediately placed under arrest. (Tr. at 11, 37, 61.) During his arrest, Defendant was patted down, and the HSI agents discovered two knives and a screwdriver on his person. (Tr. at 12, 64; <u>see</u> <u>also</u> Gov't Ex. B (photograph of the items found on Defendant's person during the search).) After Defendant's arrest, at least five HSI agents conducted a "security sweep" of the apartment with guns drawn, to determine whether there were "additional persons in the apartment that may

be a threat to the agents." (Tr. at 12, 39-40, 65.) The agents did not ask for permission to conduct the "security sweep." (Tr. at 39-40.) During the security sweep, the agents first encountered Ms. Ruiz in the living room. (Tr. at 14, 65, 79-80). Special Agent Stavropoulos spoke to Ms. Ruiz during the sweep, who was generally unresponsive but did state that she understood that the agents were conducting the sweep, and identified Defendant as her husband or boyfriend. (Tr. at 65, 72.) Special Agent DeCastro also spoke to Ms. Ruiz, asking her for her "identifiers" in both English and Spanish, but received no response. (Tr. at 23.)

    Following the security sweep, Special Agents DeCastro, Stavropoulos, and Eddie Alahverdian were directed by Defendant into his bedroom so that they could speak privately. (Tr. at 14-15, 61.) The agents asked Defendant if he lived at the apartment; Defendant replied that it belonged to Defendant and Ms. Ruiz, his girlfriend. (Tr. at 68.) Special Agent Stavropoulos then stated to Defendant that the agents knew that he was not the legal occupant of the apartment, but rather that it belonged solely to Ms. Ruiz, and that NYCHA had not authorized him to live in the apartment. (Tr. at 68-69.) Special Agent Stavropoulos testified that she said to Defendant that:

> [Defendant] wasn't authorized to live in [the apartment] and he wasn't authorized to conduct a drug operation out of that apartment because that could affect [Ms. Diaz's] ability to keep the apartment, so that he wasn't doing her any favors by running a drug operation in there.

(Tr. at 70.) Special Agent Stavropoulos "asked the [D]efendant to be truthful with [the agents] going forward." (Tr. at 69.) Special Agent Stavropoulos further testified that she said this to him to "let [Defendant] know that [the agents] did some research ahead of time and that [they] would like him not to lie to [them]." (Tr. at 69.)

    Defendant's account of this interaction, presented in the form of an Affirmation, differs from that of the agents who testified. Defendant asserted that:

> I was taken into the bedroom, where I was asked questions about the package. I was standing up. More than one agent was talking to me at the same time. One of the agents was yelling at me. He said, among other things, that I better tell him something that he wants to hear, or else Ms. Ruiz would lose the apartment. He said something along the lines of the apartment 'belonging to the city,' and that if I didn't tell him something that he wanted to hear, Ms. Ruiz would lose her apartment because she would be held responsible for the drugs that were in the package.

(Docket entry no. 18, ¶ 9.) Defendant identified the agent yelling at him as Special Agent DeCastro. (Docket entry no. 36, ¶ 3.) Defendant further affirmed that "[he] was sure that Ms. Ruiz – who was in the living room – could hear what the loud-talking agent was saying, and that the threat of losing her apartment could cause Ms. Ruiz to have a mental breakdown." (Docket entry no. 18, ¶ 10.)

Three agents entered the bedroom with Defendant - Special Agents Stavropoulos, Decastro, and Alahverdian. (Tr. at 15-16, 66, 83.) Inside the small bedroom was a bed frame, without a mattress, and some additional furniture, but no place to sit. (Tr. at 66, 15.) Defendant remained in handcuffs during this period because the agents felt it was necessary for them to safely conduct the interview given the weapons they had earlier found on Defendant's person. (Tr. at 16, 66, 68.) The agents asked Defendant about his criminal history, and Defendant reported that he had been arrested before. (Tr. at 16.) Special Agent DeCastro ordered another agent to run a criminal history query on Defendant, and the agents determined that he had "an extensive criminal history." (Tr. at 16.) After discovering Defendant's extensive criminal history, Special Agent DeCastro instructed the Defendant not to speak further, and told him that he had the right to remain silent, and that anything he did say could be used against him. (Tr. at 17.) Special Agent DeCastro further informed Defendant that he had the right to an attorney, and could have one present during this questioning. (Id.) Special Agent Stavropoulos confirmed that

"pretty much the first thing that [the agents] did when they got to the bedroom was to advise [Defendant] of his Miranda rights."  (Tr. at 84.)

After Special Agent DeCastro spoke to the defendant, Special Agent Stavropoulos read Defendant his Miranda rights from an official HSI statement of rights form.  (Tr. at 50, 67; Gov't Ex. A.)  After Special Agent Stavropoulos read the statement of rights form to Defendant, she asked him if he "understood his rights as [she] read them to him, and he said he did."  (Tr. at 68.)  Special Agent Stavropoulos did not read the "waiver" section of the form to him, which provides: "I have read, or someone has read to me, this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present." (Gov't Ex. A.)  Instead, Special Agent Stavropoulos "asked him if he was willing to speak with [the agents] after he understood his rights."  (Id.)  Defendant indicated that he was willing to speak to the agents, saying "yes."  (Tr. at 72.)

The testimony of Special Agents DeCastro and Stavropoulos were not entirely consistent regarding their advice of Defendant's rights.  While Special Agent DeCastro testified that he had advised Defendant of his rights before Special Agent Stavropoulos had read the rights from the HSI statement of rights form, Special Agent Stavropoulos did not remember anyone advising Defendant of his rights before her.  (Compare Tr. at 17 with Tr. at 66, 92.)  It is clear from the evidence, however, that Defendant was read his rights at least once, and probably twice.

The agents did not ask Defendant to sign the waiver of rights on the statement of rights form.  (Tr. at 68.)  Special Agent Stavropoulos testified credibly that "[Defendant] was under arrest and [the agents] were in his environment, so I decided, we decided against uncuffing him for the purpose of signing the form.  We didn't know what weapons could be lying around or in the drawers, since we didn't conduct a search of the apartment."  (Tr. at 68.)  The agents

testified credibly that Defendant appeared to be "calm and cooperative" and that "he didn't resist" during the questioning that followed the advice of his Miranda rights. (Tr. 69, 21.)

Special Agents DeCastro and Stavropoulos testified credibly that neither of them had threatened Defendant at any time during or after his arrest. (Tr. at 22, 70.)

Defendant was questioned for approximately 20 minutes, during which he made several incriminating statements to the agents. (Tr. 21, 24.) Finally, Defendant was taken the HSI for processing. (Tr. at 23-24.)

Defendant acknowledges that, after his arrest, an "agent was saying something to [Defendant] about [his] rights." (Docket entry no. 18, ¶ 12.) It is clear that Defendant was read his rights at least once, and that he made statements to the officers after the reading of the rights. Defendant asserts in his Affirmation, however, that "did not understand what the agent was saying to [him] about [his] rights." (Docket entry no. 18, ¶ 12.) Defendant avers that he "was confused . . . about what [he] was being told about [his] rights" because he was "focusing on what the agent was saying about Ms. Ruiz losing her apartment, and was worried about how this threat would affect Ms. Ruiz's mental health." (Id. ¶ 12.) He asserts that he "did not waive any of [his] rights . . . [and he] did not agree to answer questions without a lawyer present." (Id.) He further alleges that he only made incriminating statements concerning the package he received because the agent had made "threats that Ms. Ruiz would lose her apartment if [Defendant] did not tell them something [the agent] wanted to hear." (Id. ¶ 15.) Defendant also proffers that Ms. Ruiz suffers from a serious mental health disorder, and that his concern for her possible mental breakdown caused him to make the incriminating statements. (Id. ¶ 10.) As explained below, the Court finds, notwithstanding these assertions, that the Government has met its burden of

demonstrating by a preponderance of the credible evidence that Defendant's waiver of his right against self-incrimination was knowingly and voluntarily made.

## CONCLUSIONS OF LAW

"On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." United States v. Peterson, No. 12CR409, 2012 WL 4473298, at *6 (S.D.N.Y. Sept. 28, 2012).

The Fifth Amendment to the United States Constitution protects a defendant from being coerced into becoming a "witness against himself." U.S. Const. amend. V. "The purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver is knowing, intelligent, and voluntary." United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007). A statement made "during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [his Miranda] rights when making the statement." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (internal quotation marks omitted). "The waiver inquiry has two components: the accused's relinquishment of his rights must have been (1) knowing, which is to say that the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it, and (2) voluntary, which is to say that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." United States v. Murphy, 703 F.3d 182, 192 (2d Cir. 2012) (quoting United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011)) (internal quotation marks omitted). Courts evaluate whether a defendant's waiver of Miranda rights was

both knowing and voluntary by examining the totality of the circumstances of the interrogation. United States v. Medunjanin, 752 F.3d 576, 586 (2d Cir. 2014).

Knowing Waiver

The record demonstrates that Defendant's waiver of his Miranda rights was knowing. Special Agent Stavropoulos testified credibly that she read the HSI statement of rights form to Defendant before he made the statements at issue.[2] Afterward, she asked Defendant if Defendant understood the rights and was willing to speak to the agents and he responded affirmative to both queries. The agents also testified credibly that Defendant's demeanor was "calm," that he cooperated fully with them in their investigation, that Ms. Ruiz was quiet and largely unresponsive throughout the proceedings. Weighed against Defendant's uncross-examined assertions that the agents were yelling and that he subjectively did not understand or truly agree to waive his rights and speak without a lawyer, the Government's evidence is sufficient to support comfortably by a preponderance Defendant's understanding of his rights and knowing assent to waiver of those rights. The credibility of the agents' testimony as to his expression of understanding and assent is not undermined by their failure to read to him or have him sign the waiver section of the form. The portion of the form that was read fully communicated the relevant rights, and the agents' decision not to uncuff him to enable him to sign was reasonable in light of the weapons found at the time of his arrest.

Voluntary Waiver

In his Affirmation and arguments, Defendant asserts that his waiver of Miranda rights was neither sincere nor voluntary, arguing that his statements were coerced by improper threats regarding Ms. Ruiz's public housing benefits.

---

[2] Special Agent DeCastro also testified credibly that he had advised defendant of certain of his rights, including his right to remain silent and his right to an attorney.

As noted above, the agents testified credibly that Defendant was "calm and cooperative" during and after their advice of his Miranda rights, which indicates that he did not display any signs of perceiving threat or compulsion. Further, the agents testified that he affirmatively indicated his consent to answer questions, and he did, in fact, proceed to make statements.

Defendant argues that the agents' failure to obtain his signature on the HSI statement of rights form is indicative of a lack of consent. A written waiver, however, is not necessary to a finding of voluntariness. North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel . . . is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.") As explained above, the Court credits the agents' explanation of the reason for not uncuffing the Defendant to enable him to sign the forms.

In his Affirmation, Defendant asserts that an agent yelled at him, saying something to the effect that the apartment belonged to the City and that, if Defendant did not tell him "something [the agent] wanted to hear," Ms. Ruiz would lose her apartment. He claims to have been distracted by worry that Ms. Ruiz would overhear and react badly to these statements in light of her mental health condition, and asserts that he did not understand the advice of rights and made statements only because of worry for Ms. Ruiz. The Court gives little weight to these uncross-examined assertions.[3] The Court finds credible the agents' testimony that both Ms. Ruiz

---

[3] See United States v. Frank, 8 F. Supp. 2d 284, 291, n.2 (S.D.N.Y. 1998) ("Since [the defendant] did not testify at the hearing, and was not subject to cross-examination, the Court was unable to form an opinion as to his credibility or the truthfulness of his allegations . . . . Accordingly, the Court notes those instances in which [the defendant's] recollection of the events differs from that of the other witnesses, but finds that this circumstance carries little weight.").

and Defendant were calm, and that the only references to the apartment were the truthful statements that Ms. Ruiz was the only registered occupant and that Defendant could affect her ability to keep the apartment by occupying it without authorization or conducting a drug operation there.

If Defendant became concerned for Ms. Ruiz's tenancy on the basis of the remarks, he had good grounds to do so. Truthfully pointing out a potential collateral consequence of criminal behavior does not constitute unlawful coercion. The Fifth Amendment does not bar police from applying moral suasion to extract confessions. Colorado v. Connelly, 479 U.S. 157, 170 (1986) ("[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'") (quoting Oregon v. Elstad, 470 U.S. 298, 305 (1985)). Here, the agents drew Defendant's attention to possible repercussions of his alleged unlawful narcotics trafficking actions, and of his unauthorized use of the public housing facility. Such statements do not constitute coercion that is violative of the Fifth Amendment. See United States v. Barnett, 814 F. Supp. 1449, 1457 (D. Alaska 1992) ("The agents did not misrepresent the probable consequences of her actions or tell her that a confession would eliminate publicity . . . this would not invalidate her confession."). The agents' failure to advise Defendant that Ms. Ruiz might have had the opportunity to provide defenses and preserve her public housing benefits did not render their statements improperly coercive: government agents are not required to provide all the information potentially relevant to a defendant's decision whether or not to confess to a crime. See Moran v. Burbine, 475 U.S. 412, 422 (1986) ("[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.").

Furthermore, while Defendant's concern for Ms. Ruiz's mental health may have prompted him to decide to make incriminating statements, the mental health condition was neither created nor, as shown by the credible evidence presented at the hearing, improperly exploited by the government.  See Bryant v. Vose, 785 F.2d 364, 366 (1st Cir. 1986) (police statement that a defendant's criminal conduct may have hurt the victim's children and caused them to be afraid of him is not government compulsion).

Nor does the evidence indicate that the agents engaged in any other improper conduct that would have tended to "overbear the defendant's will to resist and bring about [a] confession not freely self-determined."  See United States v. Guarno, 819 F.2d 28, 29 (2d Cir. 1987).  "Circumstances that support a finding of involuntariness may include the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep."  Id., at 30 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (internal quotation marks omitted).  Here, no objective indicators of involuntariness are present.  The questioning lasted only about twenty minutes, and Defendant chose the location of the questioning.  Defendant does not allege that the agents used physical coercion, and Defendant was advised of his Miranda rights at least once and affirmatively indicated his understanding and consent.

The Court, having considered carefully the totality of the circumstances, finds that the Government has met its burden of proving by a preponderance of the evidence that Defendant's statements were knowing and voluntary.

Accordingly, Defendant's motion to suppress the statements is denied.

CONCLUSION

For the foregoing reasons, Defendant's motion is denied. The Court will hold a pretrial conference in this matter on March 10, 2015, at 4:00 p.m. in Courtroom 12D.

This Memorandum Opinion and Order resolves docket entry number 16.

SO ORDERED.

Dated: New York, New York
       March 6, 2015

>        /s/ Laura Taylor Swain
>     LAURA TAYLOR SWAIN
>     United States District Judge